State v. Hall.

## THE STATE v. HALL.

1. A ten-pin alley, kept for public use, in a village, is not, *per se*, a nuisance.
2. Nor is such ten-pin alley a nuisance, though kept in connection with a lager beer saloon.
3. Where it is one of the terms of the establishment, that the loser is to pay for the use of the alley, such playing is not gambling.

This was a case certified from the Oyer and Terminer of the county of Hunterdon, and was heard before the Chief Justice, and Justice Bedle. The facts sufficiently appear in the opinion delivered.

For the state, *A. V. Van Fleet,* and *B. Van Syckel.*

For defendant, *George A. Allen* and *C. A. Skillman.*

The opinion of the court was delivered by

The Chief Justice. The first point on which the advisory opinion of this court is asked is, whether a ten-pin alley, kept for gain, in a populous village, and open to public use, is, *per se*, a disorderly house or public nuisance.

It seems to me that, unless we are prepared to disturb the well settled principles of law which belong to this subject, this interrogatory cannot be answered in the affirmative.   In

a legal point of view, a house may be disorderly in two ways, viz., first, from the end or purpose to which it is appropriated; and second, from the mode in which it is kept. The end or purpose for which the house is designed, will render the keeping of such house illegal, if it be such as, of necessity, contravenes the provisions of any public statute; or be such as must be injurious to the public morals, peace, or health; or to the comfort of society. Instances of this sort are brothels, or places kept as a rendezvous for thieves. But if the purpose of the house be not necessarily injurious to society, the keeping of such house is never criminal, unless it be made so by the manner in which it is conducted. No example, I think, can be found in any adjudication which is authority in this court, which holds that the law forbids the citizen to use his house for any purpose which, in itself, is not necessarily hurtful to the community. That the particular business of the house may, by the neglect or design of the keeper, sometimes, or many times, be perverted to immoral or other noxious purposes, cannot take away from the generality the right to carry on such business. The only question is, whether the business which the house promotes is, in itself, hurtful to the community; and if it is not a house or building appropriated to a business admittedly of such a character, it is not, *per se*, a nuisance. This, it is conceived, is, and always has been the clearly established rule of law on this subject; and until the decision of the case of *Tanner* v. *The Trustees of Albion*, 5 *Hill* 121, which was cited on the argument, was, so far as is known, entirely unquestioned. The adjudication thus referred to is undeniably to the point, for the court pronounced a bowling-alley, kept for hire, to be a public nuisance, at common law, though gambling be expressly prohibited. For this doctrine, Hall's case, reported in 1 *Modern* 76; in 2 *Keble* 846, and in 1 *Ventris* 169, is called in to vouch; and Mr. Justice Cowen, who prepared the opinion in the New York case just cited, appears to have supposed that this common law authority established the proposition, that rope dancing in public, for

hire, was, in itself, a nuisance. But this is obviously a misconception, as will appear from a perusal of the case in *Ventris*, where the facts of the transaction are stated very intelligibly, as well as the reasons of the judgment founded upon them. The circumstances were these: complaint was made, says this reporter, by divers of the citizens about Charing Cross, that Jacob Hall was erecting " a great booth in the street, intending to show his feats of activity and dancing upon ropes there;" that the court thereupon ordered him to be sent for, and warned him that he should proceed no further, and directed that an indictment should be presented to the grand jury; and being afterwards informed that, notwithstanding this caution to him, he was proceeding with the building, caused him to be again brought before them, and upon his refusing to enter into a recognizance, to cease further building, he was committed, and, in the language of the reporter, " the court caused a record to be made of this nuisance, as upon their own view, (it being in their way to Westminster,) and awarded a writ thereupon to the sheriff of Middlesex, commanding him to prostrate the building. And the court said, things of this nature ought not to be placed amongst people's habitations, and that it was a nuisance to the king's royal palace, and besides, that it straitened the way, and was insufferable in that respect." Such is the best account that we have of this case; those contained in Modern and Keble, though not so full or perspicuous, are not inconsistent with it; and it is clear, therefore, that this precedent affords not the least ground for the assumption in the case in New York, that it was a decision to the effect that a public stage for rope dancing was a nuisance, *per se.* The fact is, the language of the court in Hall's case, plainly admits the legality of an exhibition of rope dancing, for the circumstance which rendered it unlawful, was the erecting a booth for such purpose near the king's palace, in a public street. The Court of King's Bench adjudged that a structure for the exhibition of a rope dancer could not be lawfully placed in a public

highway; this is familiar law, and no one will call it in question. But I am entirely at a loss to perceive how this principle sustains the doctrine enounced in *Tanner* v. *The Trustees of Albion,* which was, that similar structures were nuisances, even if put upon private property. In my estimation, the ancient case does not apply, in the remotest degree, to the modern one.

But in addition to this authority, Mr. Justice Cowen refers, in corroboration of his hypothesis, to a statement which, in Keble and in Modern, in the report of Hall's case, is put in the mouth of Chief Justice Hale, in these words : " That in the eighth year of Charles First, Noy came into court and prayed a writ to prohibit a bowling-alley erected near St. Dunstan's church, and had it." The first comment on this citation which naturally suggests itself is, the unreliable form in which this alleged statement, attributed to Lord Hale, has been transmitted to us; it is recorded as an unmeditated observation, falling from him in the progress of a cause, unexplained by any of the circumstances of the affair, and it obviously related to an occurrence which had taken place nearly thirty years before, and which is not alluded to by the reporter, Noy, who, in his capacity as Attorney General, is said to have made the motion, nor is any mention made of such proceeding by Lord Hale himself in his work on criminal law. Our only assurance therefore, of the authenticity or correctness of the alleged reminiscence of the Chief Justice, is the first volume of Modern, and the report by Keble, the former of which is a book not much to be relied on; and as to the latter, its character is so bad, that in former times it was forbidden to be quoted, and it is said, that " Park, after hearing Lord Kenyon's censures upon Keble's reports, upon returning home, burned his copy." And, indeed, if it were important to criticise minutely this saying attributed to Lord Hale, it might be pertinent to inquire how probable it is that the Court of King's Bench granted a writ, as Keble says was done, on the application of the Attorney General, to prostrate a building alleged to be a nuisance, without

State v. Hall.

either an indictment, information, or trial of the offender. And it is also obvious, that if what the Chief Justice said is to be received as authority with regard to the nature of the offence to which he referred, so it must have an equal force in favor of the doctrine of the judicial power to put an end to nuisances at common law in this arbitrary mode. But it is not necessary to pursue further this line of inquiry, for the evident reason that, so far as concerns the argument in hand, it is of no consequence whatever whether or not Lord Hale made the remark in question; for such remark does not even tend to elucidate the proposition under examination, which is, that the mere keeping, in any form whatever, of a public bowling-alley, or other similar place of resort, was an offence at common law. By the statute, 33 *Hen. VIII.*, c. 9, it was made penal for any person, with the exception of noblemen and gentlemen of a certain quality, to play at bowls, and the consequence obviously was, that a house erected for the purpose of enabling persons habitually to violate this prohibitory act, was a nuisance; so that Lord Hale's observation, admitting its authenticity, is authority simply to the effect that a place of public amusement, if kept in violation of the provisions of an act of parliament, might be abated. This is a principle no one will dispute; but it has no analogy to the question to be decided in this case. And the same observation also applies to the cases of *Rex* v. *Dixon*, 10 *Mod.* 335; *Rex* v. *Higginson*, 2 *Burr.* 1332; and *Rex* v. *Howell*, 3 *Keb.* 465, the first of which sustained an indictment for keeping a gaming house, and the last two were to a like effect, with regard to places dedicated to cock-fighting. As both these practices of gaming and cock-fighting rested under a statutory interdict, these decisions are clearly referable to admitted principles; plainly, none of them bear upon the present inquiry. On the word of Lord Coke, we know that games with dice and cards were not prohibited by the general rules of law; for in the case of *Monopolies*, 11 *Rep.* 87, he says: "Therefore, playing at cards and dice, &c., is not *malum in se*, for then the queen

could not tolerate or license it to be done;" and he then refers to various ancient acts of parliament which had prohibited, under a penalty, these " *et alios ludos vanos.*" The decisions which have arisen out of an enforcement of these statutes, and which have not been re-enacted in this country, are obviously aside from this discussion; and I find, therefore, no authority whatever which, in any respect, gives countenance to the conclusion in the case of *Tanner* v. *The Trustees of Albion.*

Nor do I think the principles upon which the case just cited is founded, and by which alone the result attained in it can be logically sustained, are such as recommend themselves to this court for adoption. That case, in my opinion, rests upon an exorbitant stretch of judicial power. The question, it will be remembered, in that case, as in this, was whether a ten-pin alley, kept as a means of profit for public use, was a nuisance at common law; and as it was not possible to find authority interdicting an establishment for the practice of that particular game, it was necessary to assert the existence of some general rule extending over that and similar cases. Even the supposed example of the bowling alley, abated by the sharp proceeding of Attorney-General Noy, would not specifically apply, inasmuch as there was not the least similitude between the pastime of bowls and the modern game of ten-pins. *Vide, Ency. Brit., tit. Bowling.* Some broad legal maxim, therefore, embracing the particular amusement which formed the subject of consideration, was to be found, and such maxim is thus boldly and distinctly proclaimed. " So far as I have been able to discover," says the opinion, " erections of every kind adapted to sports and amusements, having no useful end, and notoriously fitted up and continued with the view to make a profit for the owner, are considered, in the books, as nuisances;" and subsequently, it is maintained that whether such erections have an aptitude or tendency to produce injurious results, is not to be tried as a matter *in pais*, but is to be decided by the judge from the notoriety of the fact—the

evidence of experience. No one can avoid perceiving the extent of power, of the most arbitrary character, which this doctrine places in judicial hands. It embraces the whole field of popular amusements, its sole rule of judgment being the experience of the particular judge who is called upon, in the contested case, to act. In the case referred to, it was held that a public ten-pin alley, no matter how kept, was injurious in its tendencies, and consequently was a nuisance. Are there not courts which would pronounce a similar judgment upon theatres, if their duty called upon them to express an opinion? Some judges, doubtless, have regarded dancing as sinful : a dancing school, therefore, by force of this rule, would be a nuisance. And so with regard to public balls, of exhibitions of jugglery, ventriloquism, of gardens kept by individuals, but open to the public; skating parks, and the many similar resorts of idleness. Is it, or has it ever been the law, that the judiciary is to pass on the lawfulness or criminality of all this class of cases, by the criterion of what may seem to be the tendency of each towards public evil? It seems to me not deniable that the power thus claimed, is a very great extension of the judicial province as always heretofore understood. In my opinion, the innovation would be attended with many evils, uncompensated by any substantial public utility. I have not been surprised, therefore, to perceive that the case of *Tanner* v. *The Trustees of Albion*, has been recently referred to, with evident disapprobation, by Mr. Justice Woodruff, in the court of Common Pleas, in the state of New York. *Updike* v. *Campbell*, 4 *E. D. Smith* 575.

My conclusion is, that a house or place kept by the owner, with a view to profit, for the practice of public amusements, not in themselves prohibited by law, cannot be held to be a nuisance, unless such consequence attach from the mode in which it is kept. The mere keeping, therefore, of the ten-pin alley in question is not, *per se*, an indictable offence. If such games, as now practiced, have a tendency to produce idleness and immorality, the application for an appropriate

remedy must be made to the legislative, and not to the judicial department.

The second question upon which the opinion of this court is sought, is whether a ten-pin alley, of the character before described, which is kept in connection with a lager beer saloon, constitutes a disorderly house?

The principles above propounded indicate a negative response to this question. If neither the ten-pin alley nor the saloon be prohibited by law, in its separate state, their legal character cannot be changed by their conjunction.

The third and last question propounded to this court, is whether a public ten-pin alley, kept for hire by the game, where the practice of the loser of the game paying for the use of the alley is habitually suffered, is a common gaming house?

The solution of this question depends on the consideration, whether, under such circumstances, the parties playing lay a wager on the game which they play. The transaction is this: the keeper of the alley lets it to the players, on the condition that the loser shall pay him for its use. It would seem to be an unnecessary refinement to say, that when the players accept these terms, and play under them, that the one lays a wager with the other, dependent on the result of the play. It is obvious that the parties do not play for gain—they play simply for amusement, and it seems like putting a false gloss on the affair to call this gaming. In the case of *The People* v. *Sergeant*, 18 *Cow.* 139, this precise subject came under the consideration of the Supreme Court of the state of New York, and the result was that it was declared that such a practice did not amount to gaming. In *Blewett* v. *The State*, 34 *Miss.* 606, a similar view was expressed. There are no opposing decisions. The place of amusement in question cannot, on this ground, be declared to be illegal.

Let the Court of Oyer and Terminer be advised that, in the opinion of this court, the verdict which has been rendered should be set aside, and a new trial granted.